# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Apple iPhone Cellular number:<br>323-599-3701 | )<br>)<br>)<br>)<br>) |

Case No.   '25   MJ345

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the     Southern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ❏ contraband, fruits of crime, or other items illegally possessed;
- ❏ property designed for use, intended for use, or used in committing a crime;
- ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, U.S.C, § 545 | Importation Contrary to Law |
| 16, U.S.C. §§ 1538(c), (d), 1540(b) | Endangered Species Act |
| 16, U.S.C. §§ 3372(a)(1) and 3373(d)(1)(B) | Lacey Act |

The application is based on these facts:

See attached affidavit

- ☑ Continued on the attached sheet.
- ❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Pritting, Special Agent FWS
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means)*.

Date: _____ 02/21/2025 _____

_____
*Judge's signature*

City and state: San Diego, California

Hon. Michelle M. Pettit
_____
*Printed name and title*

# AFFIDAVIT

I, John W. Pritting, being duly sworn, depose, and state:

## INTRODUCTION

1.     I submit this affidavit in support of an application for a warrant to search the following cellular telephone:

Apple iPhone associated with the phone number 323-599-3701

and belonging to Esther Angelica VIRAMONTES

(hereinafter "**Target Device**"), as further described in Attachment A, and to seize evidence of violations of federal criminal law relating to illegal trafficking in protected Sea Cucumbers, specifically, violations of Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law); Title 16, United States Code, Sections 1538 (c), (d) and 1540(b) (knowingly engaging in trade or possessing specimens traded in violation of the provisions of the Convention on International Trade in Endangered Species, also known as the Endangered Species Act); and Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) (illegal trafficking in wildlife, known as the Lacey Act).  The **Target Device** is currently in the U.S. Fish and Wildlife Service's custody because the device was seized when the owner of the **Target Device**, Esther VIRAMONTES, was found in possession of protected wildlife in the vehicle VIRAMONTES drove to enter the United States through the San Ysidro Port of Entry (POE).

2.     The information contained in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers in the United States and Mexico, and information gained through my training and experience. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation.  All dates and times described are approximate.

**BACKGROUND**

3.     I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement.  I am presently assigned to the San Diego, California, field office and have been so employed since March of 2016.  In that capacity, I am responsible for investigating violations of, among other things, the Lacey Act, the Endangered Species Act, and smuggling statutes under Title 18 of the United States Code.  Prior to obtaining a position as an SA with the USFWS, I was employed as a Deputy Sheriff with the Napa County Sheriff's Office from 2014 to 2016. I was employed as a Game Warden for the California Department of Fish and Wildlife from 2011 to 2014. Before my civilian law enforcement career began, I was enlisted as a Security Forces officer (Military Police) in the United States Air Force from 1998 to 2002. I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program; the USFWS Special Agent Basic School; California Peace Officer Basic Training Police Academy; and the Air Force Security Forces Military Police Academy. I graduated with a Bachelor's Degree in Wildlife, Fish, and Conservation Biology from the University of California, Davis.  I have over 18 years of combined law enforcement experience. In that time, I have investigated complex natural resource crimes involving violations related to the interstate and international trafficking of natural resources.

4.     As a USFWS SA, I have conducted or been involved in multiple search warrants relating to the illegal commercialization of protected fish and wildlife, and violations of federal natural resource laws including but not limited to the Lacey Act.  I have read, studied, and received training on the laws enforced by the USFWS.

5.     The Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES") was an international agreement among approximately 183 governments, including the United States and Mexico, to protect fish, wildlife, and plants that may become threatened with extinction. CITES established import and export restrictions to protect these species from overexploitation through international trade. Under CITES, species are protected according to a classification system known as

2

"appendices." International trade in species listed in these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens and skins, parts, and products made in whole or in part from a listed species. The Endangered Species Act prohibits any person subject to the jurisdiction of the United States from engaging in any trade or possessing any specimens contrary to the provisions of CITES. 16 U.S.C. §1538(c)(1).

6.      Wildlife and plant species listed in Appendix I of CITES are threatened with extinction. Those listed in Appendix II of CITES include species not presently threatened with extinction but may become so if their trade is not regulated. Appendix II species may be allowed in trade but are strictly regulated and monitored. To import an Appendix II species into the United States, the exporter must obtain a valid "foreign export permit" issued by the specimen's country of origin before importation. Appendix III of CITES includes wildlife and plant species listed by CITES member countries as requiring international trade controls to prevent unsustainable or illegal exploitation of the species. International trade in such species is allowed only when the appropriate permits or certificates are presented.

7.      Pursuant to the federal regulations implementing CITES, an official CITES document is required to accompany all wildlife imports or exports of a species listed on a CITES Appendix. For imports from Mexico of a species listed on Appendix III, a CITES export permit from Mexico is required. 50 C.F.R. §23.20(e). If an individual wishes to travel internationally with their personally-owned wildlife subject to CITES, they may be exempt from other CITES requirements if they acquire and present upon entry a CITES certificate of ownership for the wildlife from the CITES management authority where they reside. 50 C.F.R. §23.44. In order to obtain a CITES certificate of ownership, the owner must be able to demonstrate that the wildlife was obtained lawfully. Id.

8.      All wildlife imported into the United States must be declared to the FWS. A true and complete declaration Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, must be filed at or before the time of importation. 16 U.S.C. § 1538(e);

1   50 C.F.R. § 14.61. Federal regulations also require that the U.S. FWS clear all wildlife
2   imported into the United States, and that the importer or his agent make available the
3   wildlife being imported to the officer and all required permits, licenses, or other documents.
4   50 C.F.R. § 14.52. The wildlife may only be cleared at certain ports authorized in the
5   regulations, unless specifically authorized elsewhere. 50 C.F.R. § 14.11.

6       9.    The federal wildlife protection statute known as the Lacey Act is found at
7   Title 16, United States Code, Section 3371 *et seq*. The Lacey Act makes it unlawful for
8   any person to import, export, sell, receive, acquire, or purchase any fish or wildlife or plant
9   taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the
10  United States. 16 U.S.C. § 3372(a)(1).

11      10.   To lawfully import CITES protected Sea Cucumbers, or any other endangered
12  species, a permit from the U.S. FWS is required, pursuant to 50 C.F.R. §17.21-§17.23. A
13  person who knowingly imports an endangered species without a permit has violated the
14  Endangered Species Act, 16 U.S.C. §1538(a)(1)(A).  In addition, a declaration (FWS form
15  3-177) must be filed with the FWS upon importation of any species listed as endangered,
16  pursuant to 16 U.S.C. §1538(e) and 50 C.F.R. §14.61. Criminal penalties for knowing
17  violations of all subsections of Section 1538 are found in Section 1540(b)(1).

18      11.   Pursuant to another subsection of the Endangered Species Act, Section
19  1538(d)(1)(A), it is unlawful for any person to engage in business as an importer or exporter
20  of fish or wildlife, without having first obtained permission of the Fish and Wildlife
21  Service.  The phrase "engage in business" means to import for commercial purposes.  50
22  C.F.R. §14.91.  Federal regulations create a rebuttable presumption that more than eight
23  specimens of any single species constitute a commercial quantity.  50 C.F.R. §14.4.

24      12.   *Isostichopus fuscus* (sea cucumbers or *fuscus*) are marine animal found in
25  waters off the Gulf of California in Mexico, down to Central America (Peru) and out to the
26  Galapagos islands. Since 2003, *fuscus* have been protected under Appendix III of CITES.
27  *Fuscus* are prized in some communities in the United States and abroad for their value as
28

4

a delicacy food item. A kilogram of this sea cucumber can sell for a range of $400 to $700, depending on the size, weight, sex, age, and thickness of the sea cucumber.

13.    Based on my experience and training, and conversations with others involved in enforcement of laws pertaining to fish and wildlife, I know that people involved in illegal trafficking in fish and wildlife frequently send photographs of the wildlife to others, to demonstrate the species, size and stature. Persons trafficking in fish and wildlife are also known to send photographs, text messages and emails to others regarding prices, transportation and delivery arrangements, as well as records of financial transactions involving the wildlife products. Such persons also are known to conduct internet research and save documents regarding the legal requirements for the purchase sale, transport, shipment, import and export of wildlife products.

14.    Based on my training and experience, and conversations with other law enforcement agents, I know that dealers in exotic wildlife post images of their products on the internet and send images and messages via email, Facebook Messenger, WhatsApp, and other social media platforms to potential customers to facilitate sales, which are found on cell phones.

15.    In particular, with respect to international sales, I know that business is conducted via electronic mail and cell phones, including transmission of invoices and records of payment and shipping records, in order to facilitate the international transactions. I know that in other investigations I have seen shipping records, receipts, financial records, and documents sent via email, text messages and apps found on cell phones.

16.    Based on my experience and training in working international wildlife trafficking investigations, I know that individuals must communicate well in advance with sellers, to coordinate the logistics, invoices, bills of lading, flights, and payments of international shipments, and for purchasers to make arrangements to meet with the seller to inspect the wildlife and determine if purchase is to proceed. For this reason, cell phones may contain relevant data for weeks or months before a smuggling event occurs.

17.    Specifically, based on my experience and training, searches of cellular telephones of individuals involved in the smuggling of regulated wildlife are likely to yield evidence:

a.    tending to indicate efforts to import, export, purchase, sell, transport and/or ship wildlife;

b.    consisting of images of protected wildlife;

c.    tending to indicate knowledge of the legal requirements for the purchase, sale, transport, shipment, import and export of protected wildlife;

d.    tending to identify accounts, facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that contain evidence of efforts to illegally traffic in wildlife;

e.    tending to identify co-conspirators, criminal associates, or others involved in illegal trafficking in wildlife;

f.    tending to identify travel to or presence at locations where wildlife was purchased, sold, transported and/or delivered;

g.    tending to identify the user of, or persons with control over or access to, the **Target Device**; or

h.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## STATEMENT OF PROBABLE CAUSE

18.    According to Customs and Border Protection (CBP) reporting, on February 20, 2024, at approximately 0220 hours, ESTHER VIRAMONTES entered the United States from Mexico at the San Ysidro Port of Entry, as the driver and sole occupant of a blue Toyota Corolla Cross, license plate number 9LIJ845. The vehicle was registered to VIRAMONTES'S mother, Maria VIRAMONTES. At the primary inspection booth, the primary CBP Officer asked VIRAMONTES where she was going, which VIRAMONTES responded, "Downey." During a cursory inspection of the vehicle, the primary officer observed multiple boxes in the rear cargo area of the vehicle. He asked VIRAMONTES

6

what was in the boxes, and she replied "Shrimp." The primary officer asked VIRAMONTES if she had anything else to declare besides the boxes of shrimp and she said "No." He inspected the boxes and found that they were sealed and had what appeared to be pictures of shrimp printed on them. Upon his inspection, the primary officer found the boxes to contain what he recognized as sea cucumbers. He asked VIRAMONTES if these were the shrimp, and she said "Yes." He told VIRAMONTES that they were not shrimp, but sea cucumbers, and she responded, "my cousin told me they were shrimp." At that time the primary officer referred VIRAMONTES to secondary for further inspection.

19.    According to CBP reporting, in the secondary inspection lot, CBP officers discovered a total of 89.58 kilograms of sea cucumbers in boxes. All the boxes were located in the rear cargo area of the vehicle. The vehicle is a "hatchback" where the contents of the rear cargo area are visible through the rear windscreen. The secondary officers then made contact with United States Fish and Wildlife Service (FWS).

20.    A FWS Wildlife Inspector responded to the scene and identified the sea cucumbers as genus *fuscus*, which, as noted above, are protected under Appendix III of CITES.

21.    A check of the records of the FWS indicated that there was no record of any CITES certificates offered for the importation, exportation, or trade of any sea cucumbers of this species for the period from February 20, 2024, through February 20, 2025, and no CITES certificate of ownership was issued to VIRAMONTES.

22.    At approximately 0311 hours, VIRAMONTES was interviewed by FWS Special Agent John Pritting and HSI Special Agent Ian Maclean. VIRAMONTES said she went to Mexico to pick up seafood for a man only known to her as Fernando, who is also known as "Guerro." She said Fernando has a Mexican seafood restaurant somewhere in Los Angeles, but she does not know where. VIRAMONTES said she has brought seafood back from Mexico "a few times before." She said she believed she was bringing shrimp or octopus and that she does not know what sea cucumbers are or that these particular ones are protected by the Endangered Species Act.

23.    VIRAMONTES said Fernando called her and asked her to pick up some seafood from Mexico. She agreed, because she said she goes down to Mexico often to get medicine for her migraines. She said she would meet a man in Mexico (unknown to her), at a hotel called "Pueblo Amigo," who would put the boxes of seafood in her trunk. When she crossed the border back into the United States, she would then meet another man, unknown to her, at the McDonalds parking lot in San Ysidro. That man would collect the boxes of seafood from her.

24.    VIRAMONTES said Fernando would pay her $400 to cross the seafood into the United States for her. VIRAMONTES said she met Fernando through a mutual friend that would also cross seafood for him from Mexico into the United States; however, she would not elaborate on who that friend was. Unlike her response to the primary officer, VIRAMONTES did not mention her cousin during her interview with FWS and HSI.

25.    VIRAMONTES said she believed the product in the boxes was shrimp and that is what she told the primary officer at the point of entry. When the primary officer told her she had sea cucumber, she claimed that she believed sea cucumbers were a vegetable.

26.    The Target Device was located inside a purse, inside the vehicle operated by VIRAMONTES. During the interview agents showed VIRAMONTES the device, and she acknowledged that it belonged to her. The agents asked VIRAMONTES for permission to unlock her phone and she refused. She stated that she would not be giving the agents the passcode to access her phone. VIRAMONTES added that Fernando asked her to delete her text messages with him.  She did not specify whether she had in fact attempted to delete those messages.

27.    According to CBP reporting, on February 20, 2025, after VIRAMONTES's interview with FWS and HSI agents, CBP officers issued VIRAMONTES a fine in the amount of $38,715 as a seizure penalty for Failure to Declare Merchandise. VIRAMONTES paid $5,000 of that fine on site and was released with a promise to pay the government the remaining balance of $33,715. The *fuscus* in VIRAMONTES's possession was seized.

8

28.     Based upon my experience and training, as well as consultation with other law enforcement officers experienced in the smuggling of regulated wildlife, there is probable cause to believe that evidence of the subject offenses will be found in the **Target Device**. Such evidence, which could be in the form of emails, text messages, other social messaging applications, photographs, audio files, videos, location records, or other data, is relevant to proving smuggling, and/or the illegal importation of regulated wildlife.

29.     In this case, there is reason to believe that VIRAMONTES communicated with others who were arranging the smuggling, including the individual identified as Fernando or "Guerro," and the individual VIRAMONTES reported she was scheduled to meet at the McDonald's in San Ysidro.  VIRAMONTES specified that she did exchange text messages with Fernando.  She also reported during her interview that Fernando had contacted her using her cell phone on February 19, 2025, the day she picked up the protected wildlife in Mexico, because she was late to pick up the product and late to deliver it in the United States.  Although VIRAMONTES reported that Fernando told her to delete their text messages, she did not state whether she had done so, and in any event, based on my training and experience, I know that often a forensic extraction of cell phone data can often yield deleted files including recently-deleted text messages.

30.     Moreover, I know from my training and experience that regulated wildlife smuggling, like drug smuggling, generally entails detailed and intricate planning as part of efforts to evade detection by law enforcement.  This requires planning and coordination in the days, weeks, or months prior to the relevant smuggling-related event.  Additionally, I am aware that possible co-conspirators are often unaware of a subject's apprehension and will continue to attempt to communicate with the subject after the subject is stopped at a port of entry to determine the whereabouts of their valuable cargo, particularly in the hours following the arrest.  Therefore, I believe that the appropriate date range for the search of the **Target Device** is from February 5, 2025, up to and including February 20, 2025.

## METHODOLOGY

31.    It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode," which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.  For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.  This process is time, labor intensive, and may take weeks or longer.

32.    Following the issuance of this warrant, a case agent familiar with the investigation will collect the **Target Device** and subject it to analysis.  All forensic analysis of the data contained within the device and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

33.    Based on the foregoing, identifying and extracting data for a cellular telephone subject to seizure pursuant to this warrant may require a range of data analysis techniques,

including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

34.    There have been no known prior attempts to obtain the evidence sought by this warrant.  As noted above, interviewing agents asked VIRAMONTES for consent to search her phone, and she declined to give consent or to provide her password to unlock the phone.

## CONCLUSION

35.    Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device**, as described in Attachment A, will yield evidence of violations of Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law); Title 16, United States Code, Sections 1538 (c), (d) and 1540(b) (knowingly engaging in trade or possessing specimens traded in violation of the provisions of the Convention on International Trade in Endangered Species, also known as the Endangered Species Act); and Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) (illegal trafficking in wildlife, known as the Lacey Act), as listed in Attachment B.  Accordingly, I request that the Court issue a

warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I declare under penalty of perjury the foregoing is true and correct to the best of my knowledge and belief.

John Pritting, Special Agent
U.S. Fish and Wildlife Service, Office of Law Enforcement

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on February 21, 2025.

HONORABLE MICHELLE M. PETTIT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

      Apple iPhone
      Cellular number: 323-599-3701
      ("**Target Device**")

The **Target Device** is currently in the possession of the United States Fish and Wildlife Service, Office of Law Enforcement Field Office, 610 W. Ash St. Suite 1103, San Diego, CA.

1

## ATTACHMENT B

ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below.  The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of February 5, 2025, up to and including February 20, 2025:

a.    tending to indicate efforts to import, export, purchase, sell, transport and/or ship wildlife;

b.    consisting of images of protected wildlife;

c.    tending to indicate knowledge of the legal requirements for the purchase, sale, transport, shipment, import and export of protected wildlife;

d.    tending to identify accounts, facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that contain evidence of efforts to illegally traffic in wildlife;

e.    tending to identify co-conspirators, criminal associates, or others involved in illegal trafficking in wildlife;

f.    tending to identify travel to or presence at locations where wildlife was purchased, sold, transported and/or delivered;

g.    tending to identify the user of, or persons with control over or access to, the **Target Device**; or

h.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

1

which are evidence of violations of Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law); Title 16, United States Code, Sections 1538 (c), (d) and 1540(b) (knowingly engaging in trade or possessing specimens traded in violation of the provisions of the Convention on International Trade in Endangered Species, also known as the Endangered Species Act); and Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) (illegal trafficking in wildlife, known as the Lacey Act).